**NORFOLK AND WESTERN RAILWAY COMPANY, Plaintiff–Appellant,**

v.

**TRANSPORTATION COMMUNICATIONS INTERNATIONAL UNION, Defendant–Appellee.**

**No. 93–1366.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1993.

Decided Feb. 25, 1994.

**ARGUED:** Jeffrey Stephen Berlin, Richardson, Berlin & Morvillo, Washington, D.C., for Appellant. Nora Carroll, Guerrieri, Edmond & James, Washington, D.C., for Appellee. **ON BRIEF:** Mark E. Martin, Richardson, Berlin & Morvillo, Washington, D.C.; William P. Stallsmith, Jr., Norfolk, Virginia, for Appellant. Robert S. Clayman, Guerrieri, Edmond & James, Washington, D.C., for Appellee.

Before RUSSELL and LUTTIG, Circuit Judges, and KEELEY, United States District Judge for the Northern District of West Virginia, sitting by designation.

## OPINION

LUTTIG, Circuit Judge:

This case arises from a labor dispute between a railroad and a union that was submitted to arbitration under the Railway Labor Act. The arbitration Board ruled against the railroad after drawing an adverse inference from the railroad's refusal to produce evidence. The district court granted enforcement of the arbitration award, and the railroad appeals, arguing that the arbitration Board exceeded its contractual jurisdiction. We affirm.

## I.

Appellee Transportation Communications International Union (TCU) is the recognized collective bargaining representative for the clerical employees of appellant Norfolk & Western Railway Co. (N & W). Certain of these employees—"clerk-callers" and "ice house foremen"—are employed by N & W to provide transportation to N & W's train crews in and around its Portsmouth, Ohio, railyard. They share this work with N & W management and an outside contractor.

In November 1986, N & W switched outside contractors, replacing the Yellow Cab Company with the Brown Limousine Company. In January 1987, TCU submitted a claim to N & W alleging that, in violation of the scope clause of the collective bargaining agreement,[1] Brown Limousine was performing work previously performed by members of TCU. TCU sought compensation of a full day's wages for the senior clerical employee on each shift for each day since N & W began using Brown Limousine. N & W rejected this claim at all levels of the internal grievance process. The parties then submitted the claim to Public Law Board 4454, a private arbitration panel established by agreement between N & W and TCU, pursuant to the Railway Labor Act (RLA). See 45 U.S.C. § 153 Second.

In October 1988, this Board received written submissions from the parties and conducted a hearing. The submissions consisted primarily of statistics on the number of trips Brown Limousine made during different periods. N & W's statistics, gleaned from its records, showed that in the months immediately after the switch Brown Limousine made fewer trips per day than Yellow Cab had made; TCU's statistics, collected in a study covering a later time period, showed that it made many more. In May 1991, the Board determined that the submissions were inconclusive, but that TCU's statistical study was sufficient to shift the burden of production to N & W.[2] Concluding that a joint check of N & W records was necessary to determine if Brown Limousine was performing union work, the Board ordered the parties to undertake such a check. The Board cautioned, however, that because many factors influenced the number of trips made, the results of the check would not necessarily be conclusive. See J.A. at 339–40.

N & W refused to submit to the joint check and sued in federal district court to have the order invalidated, on the grounds that the agreement creating the Board did not grant the Board authority to compel a check of its records. The district court dismissed the claim for lack of a reviewable final order. See Norfolk & W. Ry. Co. v. Transp. Communications Int'l Union, 780 F.Supp. 364 (E.D.Va.1991).

In February 1992, the Board issued its final order. Although it acknowledged that under the arbitration agreement it could only "request," not compel, the submission of additional evidence, the Board concluded that it could draw adverse inferences from a refusal to produce requested evidence. It then reasoned that N & W's refusal to submit to the joint check of its records supported an inference that the information within those records was adverse to N & W's position. Based primarily on this adverse inference, the Board sustained TCU's claim. See J.A. at 344–46.

---

1. The collective bargaining agreement provides:

   Positions within the scope of this Agreement belong to the employes [sic] covered thereby and nothing in this agreement shall be construed to permit removal of positions from the application of these rules....
   J.A. at 310.

2. The Board stated:

   [W]e find that the Organization's study takes this case out of the realm of those cases where only unsupported assertions are made which ordinarily requires a denying award due to lack of evidence to support unfounded allegations. But, *given the approach the parties have taken in this matter,* the Organization's showing is sufficient to shift the burden to the Carrier not to rebut the Organization's evidence, but to at least warrant a more detailed examination of the Carrier's records. The Carrier cannot now attack the validity of the Organization's study when the data needed to resolve this dispute is solely within the control of the Carrier.
   J.A. at 339 (emphasis added).

Significantly, the Board was at pains to emphasize that its decision was dictated by the course of the proceedings between N & W and TCU and that it was not promulgating a general rule:

> [W]e do not view our decision as any future license for the Organization to have unfettered access to the Carrier's records. Our determination in this matter relates only to the specific and unique facts in this case. It is not our intention that our action in this matter be interpreted as requiring a joint check of the Carrier's records merely because the Organization alleges, without any proof, that scope rule protected work has been given to strangers to the Agreement.

*Id.* at 347 n. 4. Specifically, the Board believed that an adverse inference was warranted because N & W had refused to produce records that it had argued were dispositive of the dispute, and some of which N & W actually had relied upon in support of its claim that it had not breached its duties to TCU. The Board reasoned that:

> [i]t was *the Carrier* who first cited the numbers of trips shown by its records. . . . [I]t was *the Carrier* who relied so heavily upon the numbers demonstrated by its records and argued that the Organization could not adequately refute that evidence.
>
> . . . .
>
> Having first raised the issue, the Carrier cannot now rely upon the data in its records and at the same time refuse to divulge the contents of its records.

*Id.* at 345 n. 3; *id.* at 347 n. 4 ("Here, the Carrier first raised the issue, refused to disclose information and the Organization was able to demonstrate through evidence it was able to gather that its position was more than just wishful speculation.").

N & W thereafter filed the instant suit to have the Board's award vacated and set aside under 45 U.S.C. § 153, First (q). On cross motions for summary judgment, the district court held that the Board, by drawing an adverse inference from N & W's refusal to comply with its request for evidence, exceeded its authority under the arbitration agreement, as well as its own understanding of that authority. The court nevertheless granted enforcement of the Board's order, concluding that *Richmond, Fredricksburg & Potomac R.R. v. Transp. Communications Int'l Union,* 973 F.2d 276 (4th Cir.1992) ("*RF & P* "), deprived it of the authority to set the order aside. This appeal followed.

## II.

■ We said in *RF & P* that a court could inquire only "whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." 973 F.2d at 281 (quoting *Bh'd of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.,* 768 F.2d 914, 921 (7th Cir.1985)). The district court, seizing upon this language, held that it was without authority to set aside the Board's order even though it found that the Board exceeded its jurisdiction, because the Board had done the job it was told to do—resolve TCU's claim. N & W argues that the district court's view of the permissible scope of its review authority under the RLA was mistakenly narrow. We agree.

The orders of a railway labor arbitration panel constituted under the RLA, including those interpreting the panel's own authority, *see W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers,* 461 U.S. 757, 765, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); *cf. RF & P,* 973 F.2d at 279 ("limits of arbitrator's authority defined by terms of parties' own submissions"), are subject to a unique standard of review which is "among the narrowest known to the law." *Union Pac. R.R. Co. v. Sheehan,* 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978) (*per curiam* ) (quoting *Sheehan v. Union Pac. R.R. Co.,* 576 F.2d 854, 856 (10th Cir. 1978)); *Norfolk & W. Ry. Co. v. Bh'd of Ry., Airline & S.S. Clerks,* 657 F.2d 596, 599 (4th Cir.1981). A court may set aside such an award only

> ■ for failure of the [Board] to comply with the [RLA]; [2] for failure of the order to conform, or confine itself, to matters within the scope of the [Board's] jurisdiction; or [3] for fraud or corruption. . . .

45 U.S.C. § 153 First (q). *See also Sheehan,* 439 U.S. at 93, 99 S.Ct. at 402. Under this

standard, a court "may not overrule an arbitrator's decision simply because it believes its own interpretation of the contract would be the better one." *W.R. Grace*, 461 U.S. at 764, 103 S.Ct. at 2182. It may reverse an arbitral decision as in excess of a board's jurisdiction only where the arbitration board's order "'does not draw its essence from the collective bargaining agreement,'" *W.R. Grace*, 461 U.S. at 764, 103 S.Ct. at 2182 (quoting *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)), or its interpretation of the contract is "wholly baseless and completely without reason," *Gunther v. San Diego & Arizona E. Ry.*, 382 U.S. 257, 261, 86 S.Ct. 368, 371, 15 L.Ed.2d 308 (1965); *see also Schneider v. Southern Ry. Co.*, 822 F.2d 22, 24 (6th Cir.1987); *Bh'd of R.R. Trainmen v. Central of Georgia Ry. Co.*, 415 F.2d 403, 411–12 (5th Cir.1969), *cert. denied*, 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970). Of course, an award that ignores the plain and unambiguous language of the arbitration contract does not "draw its essence" from the agreement, and may therefore be overturned under the RLA. *See, e.g., United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987); *Coca–Cola Bottling Co. v. Teamsters*, 959 F.2d 1438, 1442 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992); *Monongahela Power Co. v. Local No. 2332*, 566 F.2d 1196, 1199 (4th Cir.1976). But "[a]s long as the arbitrator is even arguably construing or applying the contract," the arbitrators' award must not be disturbed. *United Paperworkers Intern. Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). *See also Upshur Coals Corp. v. United Mine Workers of America, Dist. 31*, 933 F.2d 225, 229 (4th Cir.1991). As the Seventh Circuit characterized the standard: "The test is not error; it is *ultra vires.*" *Locomotive Eng'rs*, 768 F.2d at 922.

■ *RF & P* is not, as the district court assumed, to the contrary. We addressed in *RF & P* whether arbitrators were free to define the scope of authorities that could be consulted in resolving a dispute, where the parties had submitted "a broad issue without any limitations as to the permissible sources of authority." *RF & P*, 973 F.2d at 280. We held they were, so long as their definition was rationally related to the terms of the submission. *Id. RF & P* did not hold or even suggest that an award lacking any rational relationship to the contractual language, and thus in excess of a board's jurisdiction, could not be set aside by a federal court. *See id.* at 280, 281. Indeed, one of the few and narrow responsibilities of the federal courts with respect to arbitrations is to invalidate such extracontractual orders. The quote from *RF & P* upon which the district court relied was intended only to emphasize that an arbitration board's legal analysis that is undertaken on an issue within the board's jurisdiction is not subject to review by federal courts. *Id.* at 281. It was not intended to suggest that the federal courts are without authority to overturn a decision that, under the plain language of the arbitration agreement, exceeds the jurisdiction of the arbitrators. The district court accordingly was mistaken in its conclusion that it could not set aside an award that it found to contradict the plain language of the agreement between N & W and TCU.

### III.

The question for us thus becomes whether the Board's award did exceed its jurisdiction, as the district court concluded and N & W now contends. The agreement creating the Board conferred on it the power to "request" the production of evidence in addition to that initially submitted by the parties.[3] The Board concluded that, while it was without

3. The agreement provided in pertinent part:
7. ... The Board shall have authority to *request* the production of additional evidence from any party, except in [circumstances not relevant here].
....
9. Each party is charged with the duty and responsibility of including in its written sub-

missions all known relevant facts and documents as evidence. Submissions must be confined to data presented to the duly authorized representative of the parties in the handling of the cases on the property [*i.e.,* in the intracompany grievance system] with the exception of [circumstances not relevant here].
J.A. at 143–45 (emphasis added).

the power to compel compliance with its requests, it could draw adverse inferences from a refusal to produce the requested evidence in the limited circumstance where that evidence lay in the sole control of the refusing party and that party had introduced selected parts of that evidence in support of its case.

### A.

N & W first contends that, by concluding it could draw an adverse inference from N & W's refusal of the Board's evidentiary request, the Board ignored the express terms of the arbitration agreement empowering the Board only to "request" additional evidence. N & W relies principally on *Mallard v. United States District Court*, 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989), in which the Court held that the power granted to federal courts under 28 U.S.C. § 1915(d) to request attorneys to represent the indigent did not include the power to compel them, under threat of disciplinary action, to do so. In explanation of the plain meaning of the word "request," the Court wrote:

> To request that somebody do something is to express a desire that he do it, even though he may not generally be disciplined or sanctioned if he declines. Of course, somebody who frequently refuses another person's requests might not win his favor. A soldier who regularly fails to fulfill his superior's requests might not rise in the ranks as rapidly as would someone who was more compliant. But somebody who refuses a request, as the word is ordinarily used, may not be penalized formally for doing so, as a soldier who disobeyed orders might be court-martialed. In everyday speech, the closest synonyms of the verb "request" are "ask," "petition," and "entreat." The verbs "require" and "demand" are not usually interchangeable with it.

*Id.* at 301 (citation omitted). N & W argues that the Board, by drawing adverse inferences from N & W's refusal to accede to its evidentiary request, formally penalized it for its refusal and thereby transformed its power to "request" into a power to "require" or "compel." Since, it says, this contravened the plain language of the arbitration agreement, the Board's decision did not draw its essence from that agreement.

We disagree with N & W that the Board violated the plain language of the arbitration agreement. The contract creating Public Law Board 4454 confers upon the Board the power to request additional evidence. It does not address the powers of the Board to draw inferences or to assign particular weights to evidence or its absence. Nor, specifically, does it address the powers of the Board in the circumstance where, as here, a party refuses to comply with a Board request for additional evidence. Indeed, the agreement is completely silent as to how the Board is to make its decisions, stating only that it is to "make findings of fact and render awards on the cases submitted to it." J.A. at 145. In drawing an adverse inference from N & W's refusal to produce its records, therefore, the Board did not ignore the "plain contractual mandate" presented in the "clear dictates" of the arbitration agreement, as N & W contends. *Compare Williams v. North Western Transp. Co.*, 715 F.Supp. 857, 860–62 (N.D.Ill.1989) (arbitration board exceeded jurisdiction where it considered evidence which governing arbitration agreement unequivocally provided it could not consider). Nor did it undertake to draw an adverse inference from a refusal to produce requested evidence where it had not been explicitly granted the authority to request evidence beyond that submitted on the property. It merely assumed an evidentiary power that could reasonably be understood as implicit in the powers expressly conferred upon it by the parties. This assumption of an incidental power was well within the Board's discretion, as the parties had effectively ceded to the arbitrators the task of defining the scope of their power by providing in the contractual language little guidance to the arbitrators as to their powers. *See RF & P*, 973 F.2d at 280.

Having determined that the Board did not ignore the plain meaning of the language of the arbitration agreement, we need not (indeed cannot) address whether the Board's interpretation of its powers was the correct one. Even if incorrect, it was at least arguably rational and "drew its essence" from the

arbitration agreement which, without any explicit restrictions, empowered the Board to decide the claims referred to it. The drawing of an adverse inference against a party who fails to come forward with relevant evidence within its control is a reasonable and well-recognized evidentiary rule, *see, e.g.,* Frank Elkouri & Edna A. Elkouri, *How Arbitration Works* 310–11 (BNA 4th ed. 1985); *cf.* Edward W. Cleary, *McCormick on Evidence* § 272 (3d ed. 1984), which has been routinely applied in labor arbitrations, *see, e.g., Piscataway Township Bd. of Educ.,* 74 Lab.Arb. 1107, 1110 (1980) (Jacobson, Arb.); *Vickers Petroleum Corp.,* 73 Lab.Arb. 623, 625 (1979) (Carter, Arb.); *Pettibone Corp.,* 70 Lab.Arb. 383, 387 (1978) (Gootnick, Arb.); *Bh'd of Ry. & S.S. Clerks v. Midland Valley R.R. Co.,* NRAB 3d Div., Award No. 7351, at 6 (1956) (Coffey, Arb.); *Bh'd of Ry. & S.S. Clerks v. St. Joseph Union Depot,* NRAB 3d Div., Award No. 6657, at 17 (1954) (Wyckoff, Arb.).

Contrary to N & W's assertions, the Board's decision was not irrational for contradicting its own understanding of its powers under the agreement. *Cf. Upshur Coals,* 933 F.2d at 229 (arbitration award involving interpretation of law may be reversed where arbitrators understand and correctly state the law, but ignore it). The Board's stated understanding of its powers was that while it could only "request" additional evidence, it could draw inferences from the refusal of a party to produce critical and perhaps dispositive evidence in the refusing party's sole control. *See* J.A. at 344. N & W's argument that in this statement the Board contradicted itself merely restates the plain meaning argument that we herein reject.

### B.

▮ N & W argues alternatively that, even if the Board could properly have drawn adverse inferences, the inference drawn against it operated as a conclusive presumption, amounting to what was essentially a default judgment. *See Rockingham Machine–Lunex v. NLRB,* 665 F.2d 303, 305 (8th Cir.1981) ("The [adverse inference] rule permits an inference to be drawn; it does not create a conclusive presumption against the party failing to call the witness."), *cert. de-*

*nied,* 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982). N & W contends that it was irrational to sustain TCU's claim, given that the Board's original evidentiary request cautioned that the joint check of N & W's records might not fully resolve the dispute.

We disagree. Under section 153 First (q) we are without authority to second-guess the findings of the Board as long as they are not "wholly baseless and completely without reason." *See Gunther,* 382 U.S. 257, at 261, 86 S.Ct. 368 at 371, 15 L.Ed.2d 308; *see also Schneider,* 822 F.2d at 24; *Locomotive Eng'rs,* 768 F.2d at 921–22. The Board's findings are neither. Contrary to the consistent intimations by N & W, the Board never stated that the dispute would not or could not be resolved on the basis of the withheld N & W records; rather, it observed only that these records might not resolve the dispute. Therefore, there was no inconsistency between the Board's statements at the time that the joint check was ordered and its disposition against N & W on the basis of the adverse inference drawn from N & W's refusal to produce its records. Nor was it illogical for the Board to presume that a party with significant interests at stake would voluntarily produce for inspection information in its possession that is favorable or even neutral to its position, especially where that party itself had earlier advanced the information as dispositive. While the Board's inference may have been improvident in its sweep, given N & W's understandable interest in the privacy of its records, it was not without basis in reason. That the resulting findings of fact may not have been as we would have found, of course, is an insufficient basis for us to overrule the decision of the agents whom the parties chose to resolve their dispute. *See Misco,* 484 U.S. at 39, 108 S.Ct. at 371.

### CONCLUSION

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED.*